1815.

PARKIST
v.
ALEXANDER.

April 14th.

PARKIST *against* ALEXANDER AND OTHERS.

An agent or trustee, undertaking a special business, cannot, on the subject of that trust, act for his own benefit to the injury of his principal.

If an agent undertakes to judge whether he may not innocently depart from the instructions of his principal, he does it at his peril.

The registry of a mortgage is, of itself, notice, in law, to all subsequent purchasers.

And, *it seems*, that the registry of a mere *equitable* mortgage or encumbrance, is *notice* to the subsequent purchaser of the legal estate, so as to entitle such mortgage to a preference.

THE bill stated that, in 1804, *William Tucker* made a verbal agreement with *William Alexander*, now deceased, in his lifetime, for a lease to *Tucker*, in fee, for lot 4., in the village of *Little Falls*, subject to the annual rent of three pounds. That *Alexander* then acted as a sub-agent, to make verbal agreements, under *Barent Bleecker*, who was the attorney in fact of *Ellis*, the owner of the property, and authorized to make and execute leases in his name. That, a few months after that agreement, the plaintiff purchased *Tucker's right*, for three dollars, and took possession of the premises, of which *Alexander* had notice. That, in 1805, the plaintiff built a house, and made valuable improvements on the lot, and in 1806, built a barn thereon, and continued to occupy the premises, having expended above 600 dollars in improvements, until the 6th *May*, 1808, when he sold the premises, &c., to *Alexander M·Knight*, for 550 dollars, and gave him a quit-claim deed ; and to secure the payment of the purchase money, took his bond, and a mortgage on the lot, which mortgage was duly registered the 27th of *December*, 1807. That, at the time of sale, it was explained to *M·Knight*, that the plaintiff held the lot under a parol agreement only for a lease ; but that a lease should be procured from *Barent Bleecker* to confirm his title.

That in 1810, the plaintiff requested *William Alexander* to obtain a lease of *Bleecker*, pursuant to the parol agreement, and *Alexander*, accordingly, procured a lease from *Bleecker* to the plaintiff, in fee; but soon after *Alexander* discovered that the lease was incorrect in its description of the bounds of the premises, and advised the plaintiff to have the lease returned and corrected. That the plaintiff accordingly authorized *Alexander* to surrender the lease, and procure a new one to *M'Knight*, with the intent thereby to give effect to the mortgage which *M'Knight* had made to the plaintiff, and *Alexander* engaged so to do, well knowing all the facts relative to the lease.

That, at various times, in 1810 and 1811, the plaintiff inquired of *Alexander*, whether he had obtained the lease to *M'Knight*, and he answered that he had neglected to do so. That, in *April*, 1811, a default having been made in the payment of *M'Knight's* bond, the plaintiff caused the mortgaged premises to be advertised for sale, under the power for that purpose contained in the mortgage. That, on the 10th of *September*, 1811, about a month before the day of sale, the plaintiff called on *Alexander*, and offered to take the incorrect lease himself, and get it exchanged for another, as he wished to obtain the new lease to *M'Knight* before the day of sale. That *Alexander* then confessed that he had got the new lease in *his own name ;* and that he had done it for the purpose of securing a debt due to himself from *M'Knight.* That the premises were sold on the 10th of *October*, 1811, for 125 dollars, to *Thomas Smith*, the agent of the plaintiff, who executed a release to the plaintiff, on the 14th of *January*, 1812.

The bill charged that *Alexander*, in 1811, in violation of his engagement and trust, falsely represented to *Bleecker*, that the plaintiff requested to surrender the old lease, and that a new lease should be given to him, *Alexander*, which was done accordingly. That *M'Knight* is now, and has been for five years past, poor, so that the bond is of little or

1815.

PARKIST
v.
ALEXANDER.

no value, and the only security the plaintiff relies on is the mortgage. That there was a *collusion* between *M·Knight* and *Alexander* to defeat the plaintiff's mortgage. That *Alexander* died intestate, in *February*, 1813, leaving a widow, who was administratrix, and several children, his heirs at law, who are defendants. The plaintiff prayed that the lease might be assigned to him, or that the defendants should pay off the mortgage and the costs.

The *plea* and *answer* of the widow and children of *Alexander* stated, that *M·Knight* showed *Alexander* the deed from the plaintiff, and, in consideration of 700 dollars, (paid partly in cash, and part in satisfaction of an old debt due from *M·Knight* to *Alexander*,) sold and conveyed the premises to *Alexander*, by a release, dated the 5th of *January*, 1810. That the purchase was made by *Alexander* in confidence that *M·Knight* had a right to sell, and that, before the payment of the money, *Alexander* had no notice of the mortgage, or of any right of the plaintiff to the lot. That the second lease of the lot, dated *January* 1st, 1810, was obtained by *Alexander* with the consent of *M·Knight*, and without any notice of the mortgage or claim of the plaintiff. That *Alexander* purchased the lot after he had been directed to procure the lease ; and that he was first informed of the mortgage after the purchase and payment to *M·Knight*, and after the plaintiff had advertised the sale under the mortgage.

*Alexander M·Knight*, who was also made a defendant, admitted the purchase of the lot, and the bond and mortgage as stated in the bill, and that the mortgage is unsatisfied. He stated that, without any intention to defraud the plaintiff, he sold the lot to *Alexander* about the 1st of *January*, 1810, for 700 dollars, part of which was paid in cash, and the residue was to satisfy a debt due *Alexander*, but he made no disclosure of the mortgage.

It was proved by several witnesses, that the plaintiff requested *Alexander* to take back the first lease, and procure a new one, in the name of *M·Knight* ; and that *Alexander*

promised to do so, and that the reason assigned for having the new lease in the name of *M·Knight* was to save expense. It did not appear that *Alexander* knew of the mortgage, until the advertisement for the sale of the premises under it.

*Kirkland,* for the plaintiffs.

*Gold,* contra.

THE CHANCELLOR. The plaintiff is entitled to relief. The intestate was intrusted by him with the agency of procuring a lease in fee of the premises, in the name of *Alexander M·Knight*, and he promised to perform the trust. Instead of doing this, he, afterwards, purchases the equitable title of *M·Knight*, and, with the consent of *M·Knight*, but without the knowledge or consent of the plaintiff, took the lease in his own name. In consequence of this, a mortgage from *M·Knight* to the plaintiff, and which was duly registered prior to the taking of the lease, and prior to the deed of *M·Knight*, is now attempted to be superseded, by setting up this subsequent legal title in the intestate. This, I think, cannot, and ought not to be permitted. An agent, or trustee, undertaking a special business for another, cannot, on the subject of that trust. act for his own benefit to the injury of his principal. This is a sound and fundamental rule of equitable policy. (*Hardwicke* v. *Vernon*, 4 *Ves.* 411., and see the case of *Green and others* v. *Winter*,[*] *May,* 1814, and the authorities there cited.) The consent of *M·Knight* alone was not sufficient to authorize this departure from the instructions, for they were given by the plaintiff himself, and accepted as coming from him ; and if the agent undertakes to judge that he may innocently depart from them, for the sake of his own interest, and that the variation cannot be material, he does it at his peril. If it turns out that the departure will essentially affect the rights of the principal, the agent cannot, surely, establish any con-

[*] * *Ante,* p. 26—44.

1815.

PARKIST
v.
ALEXANDER.

flicting interest of his own upon such departure from his in-
structions.

I shall consider this case, then, as if the lease had been
taken in the name of *M·Knight*, and then the question is,
whether the subsequent purchase by the intestate, without
notice of the registry of the plaintiff's mortgage, can defeat
that mortgage ?   This point was settled in the case of *John-
son* v. *Stagg*, (2 *Johns. Rep.* 510.)   The registry of a
mortgage is, of itself, notice, in law, to all subsequent *pur-
chasers*, as well as mortgagees; and they are bound, at their
peril, to consult the registry.   A contrary doctrine would
shake the foundation of all mortgage security, and lead to
every species of fraud.   It is, clearly, not the doctrine of the
statute, which declares, that " no mortgage, nor any deed,
conveyance, or writing in the nature of a mortgage, shall
defeat or prejudice the title or interest of any *bona fide*
purchaser, &c., unless the same shall have been duly regis-
tered."   If this paragraph does not mean that a mortgage,
duly registered, shall be preferred to a subsequent *bona fide*
deed without notice, it is senseless and idle, and worse than
idle—it is delusive, and a snare to the unwary.   No deci-
sions of the *English* courts, upon the *English* registry acts,
in which there is any variation in the language of the provi-
sion, could induce me to change my opinion on the construc-
tion of our statute.   I had occasion, lately, in the cause of
*Frost* v. *Beekman*,* to express this same opinion; and with
me the point is absolutely at rest.

\* *Ante,* p. 288.

In this case, and for the purpose of this decision, I con-
sider what ought to be done as done, and, consequently, that
*M·Knight* had a legal estate to support his mortgage to the
plaintiff.   But if the intestate had acted as he did, without
any instructions from the plaintiff, and so as to reduce the in-
terest of *M·Knight* to a mere equitable estate at the time
that he gave the mortgage to the plaintiff, and at the time
that he gave the deed to the intestate, I think the better
opinion is, that the registry of such equitable mortgage, or

encumbrance, is notice to the subsequent purchaser of the legal estate. The statute I have cited, speaks of any " writing in the nature of a mortgage," and these words may reach to any agreement creating an equitable encumbrance. The design of the statute was, that every purchaser should look to the registry of mortgages, and see whether there was any mortgage, or any writing in the nature of a mortgage, previously executed by the grantor. Lord *Hardwicke* said, in *Hine* v. *Dodd*, (2 *Atk.* 275.) that the register act of 7 *Anne*, c. 20., was notice to all the world, but that the courts had broken in upon the statute in cases of fraud. And some of the latest and best writers on the subject (*Cruise's Digest*, vol. 4. 348. *Sug. L. of Vend.* 3d *Lond.* edit. 524—8.) admit, that the true construction of the register acts is to render the registry, even of an equitable encumbrance, notice to all persons, and that the purchaser ought to search, or be bound by the notice. But the decisions, on the subject of tacking one lien to another, as in the cases of *Bedford* v. *Bacchus*, and of *Wrightson* v. *Hudson*, (3 *Eq. Cas. Abr.* 615. pl. 12. 609. pl. 7,) are considered, in *England*, as having given a different construction to the registry acts. This doctrine of tacking has, however, been adjudged, and finally settled, with us, (*Grant* v. *U. S. Bank*, 1 *Caines' Cas. in Error*, 112.,) not to apply between registered mortgages ; and the force of these decisions is no longer to be regarded. The case of *Morecock* v. *Dickens*, (*Amb.* 678.,) decided by Lord *Camden*, in 1768, is considered as the leading and decisive authority against the doctrine of constructive notice arising from the registry of a " writing in the nature of a mortgage ;" and he seems to ground his opinion wholly upon the case of *Bedford* v. *Bacchus*, but he manifests, at the same time, a strong reluctance to be bound by such a doctrine. In that case it had been agreed, by deed between *Morecock* and *Wilson*, that a lease of lands to *Wilson* should stand as a security for 800*l.*, and this deed, containing the agreement, was duly registered

1815.

PARKIST
v.
ALEXANDER.

under the stat. of 7 *Anne. Wilson*, afterwards, mortgaged the lands to *Du̇k·ns* for 800*l.*, and delivered him the lease ; but *Dıckens*, at that time, had no notice of *Morecock's* deed. *Wilson* became bankrupt, and *Morecock* filed his bill to be paid the money in preference of the mortgage to *Dickens.* The question was, whether *Dickens*, who had got the legal interest, was to be affected with constructive notice arising from the registry of *Morecock's* deed ? and Lord *Camden* said, that he considered himself bound by the decision of *Bedford* v. *Bacchus ;* that a thousand neglects to search had been occasioned by that decision, and, therefore, he could not take upon him to alter it ; that if this was a new question he should have had his doubts, and that it was a serious question whether a court of equity should not say that, in all cases of registry, a subsequent purchaser ought to search, or be bound by the registry.

Mr. *Sugden* says, that this decision seems hardly reconcileable with the general principles of equity, and that it was founded on a mistaken application of the case of *Bedford* v. *Bacchus.* But when we consider that the principle of that prior decision is done away with us, and that except this of Lord *Camden,* and those relating to tacking encumbrances, we have no decisions on the point, and nothing but some extra-judicial *dicta,* (1 *Schoale & Lefroy,* 90. 157—160, 161.,) I think we are at liberty to give our registry act such a construction as will best accord with the obvious dictates of its policy. If the plaintiff's claim was, then, to be considered as resting upon a mere equitable mortgage, 1 should still be of opinion that the registry of that mortgage gave it a preference to the subsequent legal title of the intestate.

I shall, accordingly, give to the defendant, *Catharine M. Alexander,* as administratrix and guardian, &c. the election, either, within 30 days, to assign over to the plaintiff the lease taken in the name of the intestate, or to discharge the mortgage debt, with the costs of the foreclosure ; and, in default of

making such election, that the lease be assigned by her, as administratrix and guardian aforesaid; and that, in either case, she pay the costs of this suit.

The following decree was entered:

"That *Catharine M. Alexander,* one of the above defendants, as administratrix of the goods, chattels, and credits of *William Alexander,* deceased, and guardian to the other defendants, excepting *Alexander M'Knight,* within thirty days after being served with a copy of this decree, make her election, either to assign over to the plaintiff, and to his heirs, by an instrument valid in law, all the right, title and interest of the said *William Alexander,* at the time of his death, of, in, or to the lease mentioned in the pleadings in the above cause, bearing date on or about the first day of *January,* in the year of our Lord one thousand eight hundred and ten, and taken by the said *William Alexander,* deceased, in his own name, and given for town lot No. 4., in *First-street,* in the village of *Little-Falls,* and accompany the said assignment with actual delivery of the lease, or to pay to the plaintiff the principal and interest due on the bond and mortgage mentioned in the said pleadings, and executed by *Alexander M'Knight,* one of the defendants, to the plaintiff, and bearing date the sixth day of *May,* in the year of our Lord one thousand eight hundred and eight, together with necessary costs and expenses of the plaintiff, accrued in advertising and selling the lot under a power contained in the said mortgage; and, in case the said *Catharine M. Alexander* shall, within that time, elect to discharge the mortgage debt and costs as aforesaid, and shall signify her election in writing, subscribed by her, or her solicitor, or counsel, and served on the plaintiff, his solicitor or counsel, or filed in the register's office, it is further ordered, that it then be referred to one of the masters of this court, residing in *Albany, Oneida,* or *Herkimer* counties, to ascertain and report, with all convenient speed, the amount of such principal and

interest and expenses as aforesaid; and that upon confirma-tion of such report, the same be paid: and if no such elec-tion be made within the time aforesaid, it is further ordered, adjudged, and decreed, that the said *Catharine M. Alexander,* immediately after the expiration of the said thirty days, as-sign and deliver the lease as aforesaid. And it is further ordered, adjudged, and decreed, that, in either case, the said *Catharine M. Alexander* pay to the plaintiff his costs of this suit, to be taxed."

